ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 
DATE FILED: 9/3/26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TANYA TAYLOR,

Plaintiff,

- against -

THE LONG TERM DISABILITY INCOME PLAN FOR EMPLOYEES OF THE FEDERAL RESERVE SYSTEM, AND MATRIX ABSENCE MANAGEMENT, INC.,

Defendants.

25 Civ. 01134 (LLS)

OPINION & ORDER

Defendants Matrix Absence Management, Inc. and the Long Term Disability Income Plan for Employees of the Federal Reserve System move for judgment on the administrative record, or in the alternative, summary judgment. (Dkt. No. 41). For the following reasons, defendants' motion is denied.

**Background**

The following facts are taken from Defendants' Statement of Material Facts ("SOMF") (Dkt. No. 43), Plaintiffs' Counterstatement of Material Facts ("COMF") (Dkt. No. 44-1), and an Administrative Record containing all records related to the claim.[1] (Dkt. No. 31).

[1] The Court previously determined discovery would be limited to the materials in the Administrative Record. Taylor v. Long Term Disability Income Plan for Emps. of Fed. Rsrv. Sys., 2025 WL 3640397, at *1 (S.D.N.Y. Dec. 16, 2025). A Matrix Compliance Assistant authenticated the Administrative Record and confirmed it contains "all of the records relating to Matrix's review of Ms. Taylor's claim." Decl. Alyssa Long (Dkt. No. 45). Citations to the Administrative Record are denoted as "AR" throughout this Order.

## I. The Long Term Disability Plan

Plaintiff Tanya Taylor worked at the Federal Reserve Bank of New York from December 21, 2020 through August 30, 2021. SOMF ¶¶ 1, 5. She enrolled in the Federal Reserve's Long Term Disability Income Plan (the "Plan"), which was managed by Matrix Absence Management, Inc. ("Matrix"). SOMF ¶¶ 4, 12. The Plan's purpose is "to provide long term disability benefits for eligible Employees of the Federal Reserve System who are unable to work due to a mental or physical disease or bodily injury, and to assist those Employees, whenever appropriate, to return to work." SOMF ¶ 6; see also AR_2586-622 (hereinafter "Plan").

To receive long-term disability ("LTD") benefits, participants must be "Totally Disabled" for two distinct periods: (1) the "Own Occupation Period," or "the first eighteen (18) months of any Period of Total Disability, beginning on the first day of the Elimination Period," and (2) the "Any Occupation Period," which is "the period beginning after the end of the Own Occupation Period and ending on the last day the LTD Payee is eligible for LTD benefits." Plan § § 2.4, 2.26. The Plan defines "Total Disability" or "Totally Disabled" as:

> (a) during the Own Occupation Period the Participant or LTD Payee is unable solely because of illness or injury to work on a regular and full time basis (as defined below) at his own job or Another Job in his Own Occupation, and

> (b) during the Any Occupation Period, a Participant or LTD Payee is unable, solely because of illness or injury to work at Any Occupation.
>
> All determinations of Total Disability are made by the Medical Board in its sole discretion.
>
> A "regular and full time basis" means the work schedule in effect before the Period of Total Disability began and prior to any accommodations, or other adjustments, having been made by an Employer.

Plan § 2.41. Taylor's "Own Occupation" period concluded on February 28, 2023, and her "Any Occupation" period began the same day. AR_472-73.

**II. Taylor's Accident and Medical History**

On or about August 28, 2021, Taylor was rear-ended in a motor vehicle accident. SOMF ¶ 17. Two to three days after the accident, Taylor began to experience frozen or numb hands and legs, severe pain on her right side, and an inability to sit for long periods of time. SOMF ¶ 18.

Dr. Yolande Bernard examined Taylor shortly after her accident and diagnosed her with a cervical spine strain/sprain, a thoracolumbar spine strain/sprain, myofascial pain syndrome, bilateral upper and lower extremity pain and radicular symptoms, and pain in both clavicles and both feet. AR_1692. She approved Taylor for Magnetic Resonance Imaging ("MRI") and electrodiagnostic testing, which revealed a C6 radiculopathy, diffuse disc hydration loss, disc bulges, and disc herniations on her cervical spine. AR_1700, 1715-18. Dr. Bernard then

referred Taylor to a spine and pain management specialist to treat these conditions. AR_1703.

The accident also caused a partial thickness rotator cuff tear in Taylor's shoulder. AR_1253. Dr. Emmanuel Hostin, an orthopedic surgeon, performed arthroscopic surgery to treat the tear on April 1, 2022. AR_1434. Dr. Hostin's follow-up notes indicate Taylor discontinued the use of her sling in May 2022 and was discharged in October 2022. AR_1430, 33.

After Taylor's discharge from Dr. Hostin, she began seeing Dr. Rohit Verma, another orthopedic surgeon, for her continued cervical and lumbar spinal pain. AR_1489. A physical examination revealed Taylor's "limited, painful" cervical and lumbar spinal ranges of motion, which was exacerbated by prolonged sitting or standing. AR_1489-90. Dr. Verma diagnosed Taylor with degenerative cervical disc and lumbosacral spondylosis. AR_1490.

In November 2022, Dr. Verma referred Taylor to Dr. Jeffrey Chacko, a pain specialist. AR_1446. Taylor told Dr. Chacko her neck pain was "8 out of 10," with numbness, tingling, and weakness in her wrist, forearm, and hand. AR_1446. She also reported difficulty with daily activities, including cooking, dressing, and bathing. AR_1446. Dr. Chacko performed two rounds of cervical epidural steroid injections in December 2022 and January 2023, which were supposed to "help [Taylor] return to normal activities including work and increase ability to perform

[activities of daily living] independently and consistently." AR_1439-40, 45, 54-56. However, a follow-up examination revealed the injections were ineffective, and Taylor's pain "persists and is worsening." AR_1450. Dr. Chacko documented Taylor's muscle spasms, tenderness to palpation, and decreased range of motion in her cervical and lumbar spine. AR_1451. He recommended medication and acupuncture treatment. AR_1453.

Taylor returned to Dr. Verma in March 2023. AR_1481. Dr. Verma agreed that the steroid injections "caused exacerbation of [Taylor's] pain," and recorded Taylor's cervical and lumbar spinal range of motion as "limited, painful" after a physical examination. AR_1481. Dr. Verma discussed surgical options with Taylor, including Anterior Cervical Discectomy and Replacement or Spinal Fusion. AR_1484.

In May and June 2023, Taylor pursued alternative medical treatments at a yoga retreat in Bali, Indonesia and a medicinal program in India. SOMF ¶ 42, 45. Taylor reported that she "felt almost normal" during the Bali trip, but that "she came back and the brain fog came back, [and] the pain returned (not as bad as before)." AR_2282. She also reported that "her pain is 70% better" after the treatment in India, but she experienced residual numbness and tingling in her right arm. AR_1878.

On June 13, 2023, Taylor met with Dr. Louis Nkrumah, a neurosurgery and spine specialist, for an initial surgical

consultation. AR_1979. Dr. Nkrumah noted Taylor's neck pain, bilateral upper extremity radiculopathy, and low back pain with bilateral lower extremity radiculopathy, which had been "worsening over the last 2 years" since Taylor's accident. AR_1982. Taylor reported her symptoms were exacerbated by prolonged sitting and standing, and that her pain prevented her from holding a pen to write or performing other activities of daily living. AR_1982. Dr. Nkrumah recommended neurosurgical intervention, including a C6-C7 Total Disc Replacement and L5-S1 Transforaminal Lumbar Interbody Fusion. AR_1983. On October 30, 2023, Taylor elected to continue conservative treatment options instead of surgery. AR_1988.

On July 27, 2023, Taylor was referred to a third orthopedic surgeon, Dr. Edmond Cleeman, for "medial, intermittent sharp pain" in her right knee. AR_1871. Dr. Cleeman noted that her symptoms began "about a month ago," and although there was "no recent trauma," Taylor "had been in a motor vehicle accident 2 years ago and is on disability." AR_1871. Dr. Cleeman ordered an MRI of Taylor's knee, which revealed medial and lateral meniscus tears. AR_1874. In August 2023, Dr. Cleeman advised Taylor to modify her activities and proposed arthroscopic surgery if her symptoms persisted. AR_1875.

On September 6, 2023, Taylor began seeing Dr. Lefteris Politis, a chiropractic physician, for neck and upper back pain,

which began after she was bench pressing two fifteen pound dumbbells. AR_1655. Dr. Politis conducted a physical examination and noted muscle spasms, severe tenderness, and pain along her spine. AR_1655. He diagnosed her with nerve root compression and cervical radiculopathy. AR_1655. Dr. Politis's records note that Taylor's neck and upper back pain functionally limit her ability to "maintain[] a body position: remain[] seated, sitting." AR_1656-69, 1989. Dr. Politis also treated Taylor's right knee pain, and he noted her meniscal tear created "increased pain levels [and] decreased functional use," including her ability to "maintain[] a body position: remain[] standing." AR_1656-69, 1989.

From October 2022 to September 2023 Taylor completed regular physical therapy sessions with Dr. Asha Dua to treat her neck, cervical, and lumbar spinal pain. AR_1386-88, 1639-46. Dr. Dua recorded Taylor's subjective reports of "dull, aching, stiff, and radiating" pain and observed a limited range of motion throughout her treatment. AR_1386-413, 1639-46. She also regularly noted Taylor's functional limitations in grooming/dressing, overhead/forward reaching, lifting/carrying, and ambulation/stair negotiation. AR_1386-413, 1639-46.

Beginning in July 2023 and continuing until at least January 2024, Taylor received acupuncture treatments for right leg pain. AR_1878-1932. The treating provider, Jennifer Gibbons,

noted small protrusions on the C3/C4 and C5/C6 vertebrae as well as "lots of pain and hypertonicity in the L/S paraspinals and superior SI joint." AR_1878.

While undergoing treatments for her physical impairments, Taylor also sought mental health treatment from Lori Dixon, a therapist, and Dr. Chineze Worthington, a psychiatrist. Taylor saw Dixon from June 2023 until at least February 2024. AR_1840-1865. During her sessions, Ms. Dixon noted that Taylor presented dysthymic to euthymic mood fluctuations, panic attacks, and anxious and depressive symptoms. AR_1840-1865. Taylor saw Dr. Worthington from December 6, 2022 until at least February 27, 2024. AR_1614-34, AR_1934-77. Dr. Worthington documented her depression and anxiety symptoms, and her DSM-5 diagnoses of Generalized Anxiety Disorder and Major Depressive Disorder, for which she prescribed various psychiatric medications. AR_1614-34, AR_1934-77.

**III. Taylor's Claim History**

On May 26, 2022, Matrix approved Taylor's LTD benefits. SOMF ¶ 26. Matrix informed Taylor that she "will continue to receive benefits as long as you meet the Plan definition of Total Disability, are receiving Appropriate Available Treatment and remain under the regular care of a licensed and qualified physician that is suitable for your condition." AR_467. Matrix advised Taylor that it would continue to monitor her Total

Disability status and periodically request updated medical records to verify her continued eligibility. AR_467.

On March 29, 2023, Matrix denied Taylor's LTD benefits under the "Own Occupation" definition of Total Disability. SOMF ¶ 31. Taylor appealed, and on July 21, 2023, Matrix reversed its determination and reinstated Taylor's benefits. SOMF ¶ 52.

On September 6, 2023, Matrix began reviewing Taylor's medical file to determine whether she continued to qualify as Totally Disabled under the Plan. SOMF ¶ 59. Matrix requested updated medical records from several of Taylor's treating providers. AR_517.

On December 1, 2023, Matrix determined Taylor was no longer Totally Disabled via letter (the "Denial Letter"). SOMF ¶ 63. The Denial Letter summarized findings from Dr. Cleeman, Dr. Dua, Dr. Politis, and Dr. Worthington and concluded Taylor was "not Totally Disabled from performing Any Occupation, given your education, training or experience." AR_518.

On February 20, 2024, Taylor appealed the denial. SOMF ¶ 68. On appeal, Matrix commissioned two independent peer reviews of Taylor's records by Dr. Robert Holladay, a board-certified orthopedic surgeon, and Dr. Brandon Erdos, a board-certified psychiatrist. SOMF ¶ 103. Both physicians determined Taylor could perform the material duties of sedentary, gainful employment. SOMF ¶¶ 110, 117. Matrix submitted Taylor's file to

Vocational Rehabilitation Specialists who identified alternative occupations Taylor could perform at a sedentary exertion level. SOMF ¶ 124. Matrix affirmed its denial on June 11, 2024 (the "Final Denial Letter"). SOMF ¶ 69.

Taylor commenced the present action for reinstatement of benefits on February 7, 2025. (Dkt. No. 1). On December 16, 2025, the Court held that ERISA did not govern Taylor's Plan, limited discovery to the Administrative Record, and determined it would evaluate her claim under an arbitrary and capricious standard of review. Taylor v. Long Term Disability Income Plan for Emps. of Fed. Rsrv. Sys., 2025 WL 3640397, at *1-2 (S.D.N.Y. Dec. 16, 2025).

**Legal Standard**

Matrix's motion for judgment on the administrative record should be treated as a motion for summary judgment. The Second Circuit has explained that a motion for judgment on the administrative record "does not appear to be authorized in the Federal Rules of Civil Procedure," and that "[m]any courts have either explicitly or implicitly treated such motions […] as motions for summary judgment under Rule 56." Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003).

However, denial-of-benefits claims do not fit neatly within the traditional summary judgment framework. This is because the Court's role is not to determine whether disputed factual issues

exist regarding a claimant's disability, but to "review[] the record and [make] legal conclusions" about whether a plan improperly denied a claimant's benefits. Miles v. Principal Life Ins. Co., 720 F.3d 472, 485 (2d Cir. 2013).

"When a non-ERISA plan vests discretionary authority in an administrator to make benefits determinations, as the Plan does here, those determinations may only be set aside if they were made arbitrarily or capriciously." Taylor, 2025 WL 3640397 at *2 (citing Welland v. Citigroup, Inc., 2003 WL 22973574, at *11 (S.D.N.Y. Dec. 17, 2003)). "If the decision is supported by a reasonable basis, the court may not substitute its judgment for that of the employer on disputed factual issues." Welland, 2003 WL 22973574, at *11.

## Analysis

Matrix's denial of Taylor's LTD benefits suffers two fatal defects: Matrix selectively reviewed Taylor's medical records, and it mischaracterized the limited medical records it reviewed. These defects render Matrix's denial arbitrary and capricious.

### I. Selective Review of Taylor's Medical Record

Matrix selectively compiled Taylor's medical records and summarily dismissed evidence she submitted on appeal. Consequently, Matrix did not "take into account all available information" when reviewing Taylor's appeal, in violation of the Plan's terms. Plan § 9.3(a).

**A. Incomplete Medical Record**

In September 2023, Taylor provided Matrix with a list of her treating providers to assist its evaluation of her LTD eligibility. Taylor sent Matrix contact information for Dr. Bernard, Dr. Hostin, Dr. Duroseau, Dr. Dua, Dr. Chacko, Dr. Verma, Dr. Worthington, Dr. Nkrumah, Dr. Cleeman, Dr. Politis, and Lori Dixon. AR_402-403. Per Matrix's Denial Letter, it requested medical records from Lori Dixon, Brianna Arjona, Dr. Cleeman, Dr. Worthington, Dr. Dua, Dr. Politis, and Dr. Nkrumah. AR_517. This list omits five treating providers Taylor identified: Dr. Bernard, Dr. Hostin, Dr. Duroseau, Dr. Chacko, and Dr. Verma.

The Administrative Record reveals that Matrix in fact requested records from some, but not all, of the omitted providers. See AR_1604, 11, 86. However, Matrix did not consider the records it received from the omitted providers because they originated before July 1, 2023. See AR_1604, 11, 86. The Administrative Record and Matrix's communications to Taylor do not explain why Matrix selected July 1, 2023 as the record review period. This date does not correspond to the end of Taylor's "Own Occupation" period, or the beginning of her "Any Occupation" period. It also does not correspond to Matrix's prior record requests, which were sent in March 2022, October 2022, and December 2022. AR_873, 1105, 1108, 1150. Nor did

Matrix uniformly use July 1, 2023 as the record review period. For example, it requested from Dr. Worthington "all records from 3/1/23 to present." AR_1613. Matrix does not explain why some providers received July 1, 2023 as the record review period and others did not.

Matrix's Denial Letter also represents that two of Taylor's clinicians, Dr. Nkrumah and Lori Dixon, did not have records in the relevant time frame for Taylor. AR_517. The Administrative Record does not contain record requests sent to Ms. Dixon or Dr. Nkrumah, although it contains requests sent to Taylor's other treating providers. See, e.g., AR_1635, 38, 47.

It is undisputed that Taylor saw Ms. Dixon several times after July 1, 2023, and medical records from these appointments were filed with Taylor's appeal. AR_1845-65.

Taylor also saw Dr. Nkrumah twice before Matrix issued its Denial Letter, once on June 13, 2023 and once on October 30, 2023. AR_1979, 1984. Matrix did not consider the June 13, 2023 record because it occurred two weeks before July 1, 2023, and therefore was not within the "dates requested." AR_1636. Dr. Nkrumah did not submit the October 30, 2023 record because Matrix's record vendor sent him a notice on October 8, 2023 informing him to cancel Matrix's medical record request because "[t]he information is no longer required." AR_1808.

Matrix concedes this cancellation notice was "confusing" and "a misunderstanding," but maintains it "did not impact [...] the Claims Operations Team's review of Ms. Taylor's continued eligibility to receive benefits." AR_537. Not so. Taylor's primary disabling condition, as acknowledged by Matrix, was her "lumbar and cervical disc disease, [which] caused limitations and inability to work full time in [her] own occupation." AR_517. Yet, because of Matrix's arbitrarily selected record review period, it did not consider records from the Taylor's spine specialist before denying her benefits.

Matrix "may not arbitrarily refuse to credit a claimant's reliable evidence, including treating opinions." Martin v. Fed. Rsrv. Bank of Cleveland, 175 F.4th 662, 676 (6th Cir. 2026)(citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003)) (analyzing the same Plan and the same defendants under the same legal standard as the present matter). "An administrator's decision not to consider treating physicians' opinions is arbitrary and capricious where the administrator has failed to offer a reasoned explanation, based on evidence, for its outcome, and we are unable to infer such an explanation based on the evidence." Martin, 175 F.4th at 676. Here, Matrix acted arbitrarily by selectively contacting Taylor's treating providers for updated medical records, and only considering records after July 1, 2023 for some, but not

all, providers. Matrix offers no reasoned explanation for these decisions, and the Court cannot infer one.

**B. Failure to Review Evidence on Appeal**

Taylor appealed Matrix's denial and submitted a complete medical record, including all records from Lori Dixon and Dr. Nkrumah, as well as updated medical records from Drs. Politis and Worthington, new medical records from Jennifer Gibbons, and two new narrative reports from Dr. Politis and Dr. Sylvia Mohen, a neurosurgeon treating Taylor. AR_1816-19.

It appears that Matrix either ignored or did not sufficiently review these records before affirming its denial. Matrix's Final Denial Letter is thirteen single-spaced pages. Five of these pages summarize the records Matrix obtained before Taylor's appeal, yet the letter discredits Taylor's newly submitted records in a single conclusory paragraph reading:

> [W]e received your formal notice and request for an appeal review of the December 1, 2023, termination of LTD benefits. With this appeal notice, you supplied narrative letters from Dr. Politis, and Sylvia Mohen, M.D., as well as updated office/progress/treatment notes from Ms. Dixon, Dr. Nkrumah, Dr. Worthington, Dr. Politis, Jenn Gibbons, MSTOM, and Manhattan Orthopedics. However, we did not find there was sufficient evidentiary support to overturn the termination decision. We disagreed with you and felt the information continued to substantiate Ms. Taylor's ability to return to work. There was nothing to suggest your client could not have performed the duties of the alternative, gainful occupations previously identified in the REA while she awaited any possible procedure.

AR_537. Matrix's denial thus failed to meaningfully address any of Taylor's medical records after July 2023, which include updated information on her diagnoses, the progression of her symptoms, her physicians' objective findings, and her ongoing treatment.

Critically, these records contradict Matrix's conclusion that Taylor could perform a sedentary role or "could have even performed at more strenuous exertion levels." AR_539. Dr. Nkrumah's records note Taylor's "symptoms are worse with prolonged sitting, standing, walking," and "her symptoms have significantly impacted her quality of life. She still has been unable to work since this motor vehicle accident and continues to have difficulty performing her ADLs [activities of daily living]." AR_1987. Dr. Politis's medical narrative, which is substantiated by his clinical findings, concludes Taylor's "ability to perform gainful employment on a full-time basis would be limited due to her pain, inflammation and loss of motion." AR_1836. Dr. Mohen's medical narrative reports that Taylor "has had episodes of acute disorientation," and "her ability to solve problems and process information is reduced." AR_1838. Dr. Mohen concludes that Taylor's "prognosis remains unknown" and "she should be approved for accommodations." AR_1838.

As with its initial assessment of Taylor's medical records, Matrix may not refuse to credit Taylor's reliable medical evidence submitted on appeal without offering a reasoned explanation. Matrix provided no explanation for why it did not consider Taylor's appeal records other than that it "disagreed" with Taylor and "felt the information continued to substantiate Ms. Taylor's ability to return to work." AR_537. These statements are insufficient to support Matrix's denial of benefits.

Matrix's selective record review was arbitrary at the time it issued its Denial Letter, and that error was compounded on appeal because Taylor's Plan mandates that Matrix's appellate review "will take into account all available information, regardless of whether such information was submitted or considered in the initial benefit determination[.]" Plan § 9.3(a). "[W]here the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." McCauley v. First Unum Life Ins., 551 F.3d 126, 133 (2d Cir.2008). Matrix acted arbitrarily and capriciously by selectively reviewing Taylor's medical records, and it again acted arbitrarily and capriciously by failing to adhere to the Plan's established appellate procedures.

## II. Mischaracterization of Taylor's Medical Record

"An administrator may, in exercising its discretion, weigh competing evidence, but it may not [...] cherry-pick the evidence it prefers while ignoring significant evidence to the contrary." Winkler v. Metro. Life Ins. Co., 170 F. App'x 167, 168 (2d Cir. 2006). An administrator's denial is arbitrary if it "mischaracterizes the quality and detail of the evidence" submitted on appeal or "ignore[s] detailed descriptions constituting clear proof of total disability." McCauley, 551 F.3d at 135.

Matrix terminated Taylor's disability benefits because "[m]edical records reviewed indicated no restrictions or limitations noted that would preclude you from sedentary work function." AR_518; see also AR_539 (same conclusion in Final Denial Letter). This conclusion is arbitrary because Matrix's Final Denial Letter includes medical evidence that is "based on a selective reading of the record that is not reasonably consistent with the record as a whole." Miles, 720 F.3d at 489.

### A. Dr. Asha Dua

Matrix asserts that Dr. Dua "did not suggest or note [Taylor] could not perform sedentary work" because Taylor "had a cervical range of motion near normal and well-intact upper and lower extremity strength." AR_533. Dr. Dua's records do report Taylor's cervical spine is "within functional limits" and her

upper and lower extremity strength is rated 4/5. See AR_1118, 1395, 1408. However, those same records include Dr. Dua's conclusion that Taylor "has difficulty in all activities of daily life" and "is totally disabled at this time." AR_1118, 1395-96, 1408-09. Matrix selectively excerpted portions of Dr. Dua's reports indicating Taylor was not disabled, while omitting Dr. Dua's conclusion that Taylor was "totally disabled" from its summary.

**B. Dr. Lefteris Politis**

Matrix asserts that Dr. Politis's "exams found [Taylor] exhibited no signs of weakness," and therefore "nothing suggesting that […] she was restricted or limited in her ability to function daily - at home or at work." AR_535. This misstates Dr. Politis' records. Dr. Politis' last physical examination of Taylor was on December 20, 2023, approximately three weeks after Matrix denied her benefits. AR_1989. At this exam, Dr. Politis recorded Taylor's "weakness in her neck muscles and hand." AR_1989. Taylor was unable to extend or rotate her spine without moderate to severe palpable pain, and she experienced "painful spasm[s]" when rotating her neck. AR_1989. Dr. Politis concluded Taylor's "current functional limitations" were "maintaining a body position: remaining seated, sitting," and "hard & arm use: pulling objects, pushing objects." AR_1989. These limitations were aggravated by "sitting, lying down," and Dr. Politis noted

Taylor experienced "pain prolonged sitting > 15 min." AR_1989. These findings are consistent with the limitations Dr. Politis noted at two physical examinations in September 2023. AR_1653, 58. On January 20, 2024, Dr. Politis concluded Taylor's "ability to perform gainful employment on a full-time basis would be limited due to her pain, inflammation, and loss of motion." AR_1836.

Dr. Politis also treated Taylor's right knee pain, but the Final Denial Letter discounts his treatment records because Taylor's knee injury was not "related to the original right shoulder injury" she sustained after her accident. AR_535. This is inconsistent with Matrix's first Denial Letter, which considered her right knee injury as a disabling condition. AR_518. It is also inconsistent with Taylor's medical record, which includes documentation of "numbness and tingling in her legs greater on right" at a physical examination immediately following her accident. AR_1689. Her knee pain persisted throughout the years, as documented by Dr. Verma's findings that her right knee extension and flexion were "weak" and Dr. Cleeman's diagnoses of right knee medial and lateral meniscus tears. AR_1482, 1874. Yet, Matrix omits these details from its Final Denial Letter.

**C. Dr. Chineze Worthington**

Matrix concluded Taylor "was able to work from a psychiatric perspective" because Dr. Worthington's "notes did not provide sufficient details to explain how the reported symptoms would limit Ms. Taylor's capacity" and "she was generally not having problems with performing activities of daily life." AR_535. To support this conclusion, Matrix noted Taylor's report to Dr. Worthington that she recently travelled internationally to Indonesia and India. AR_535.

Dr. Worthington documented Taylor's persistent problems with activities of daily life, including that she uses dictation devices "due to her physical limitations," that "some days [she] can't leave her bed" due to her back pain, and that she experiences challenges with cooking because "things fall[] out of her hands." AR_1970, 1939.

Dr. Worthington also connected Taylor's physical impairments to her psychiatric impairments, including observing that the possibility of cervical spine surgery "increased anxiety and symptoms of panic" for Taylor and triggered a panic attack so severe that Taylor "almost went to the hospital twice because she thought she was having a heart attack." AR_1940, 1951. During one visit, Taylor reported that the stress of possible surgery put her "in a constant state of anxiety, I don't sleep, I can't concentrate" and "she had the thought 'I

wonder what would happen if I'm not here anymore.'" AR_1959. Dr. Worthington also observed that Taylor's depression was triggered "when [she] has physical symptoms (neck pain, hand pain)." AR_1963.

Matrix disregards Dr. Worthington's professional observations and instead focuses on how Taylor's recent travels indicate that she was not disabled or functionally limited. This is arbitrary and capricious.

**D. MRI Findings**

Matrix asserts that Taylor's MRI studies showed "minimal contact with her L4 nerve and small central protrusions, respectively, they did not show there existed any spinal canal or foraminal narrowing. No other abnormalities were noted." AR_533. This is misleading. After reviewing the images, Dr. Verma diagnosed Taylor with "degenerative cervical disc" and "spondylosis of lumbosacral region without myelopathy or radiculopathy." AR_1487. Dr. Nkrumah also reviewed the images and further diagnosed her with "cervical disc herniation C6-C7," and "L5-S1 disc degenerations and disc herniation with bilateral lateral recess stenosis." AR_1982. Both Dr. Verma and Dr. Nkrumah recommended Taylor undergo spinal surgery. AR_1484, 1982. These diagnoses and recommendations are inconsistent with Matrix's conclusion that the MRIs prove she can return to work in a functional, full-time capacity.

**III. Legal Relief and the Right to a Jury Trial**

Having determined Matrix arbitrarily denied Taylor's LTD benefits, the Court next addresses how Taylor's claim should proceed. Taylor argues that because ERISA does not govern her Plan, she is entitled to a jury trial. P. Br. at 7 (Dkt. No. 44). Her Complaint characterizes her claim as a breach of contract, and she asserts "[b]ecause this is an action at law, [she] is entitled to a trial by jury under the Seventh Amendment to the United States Constitution." P. Br. at 6.

However, Taylor's Complaint includes only one Count, labelled "Breach of Contract 29 U.S.C. §1132 (A)(1)(B)," which is the ERISA statute permitting civil actions to recover benefits. Compl. at 4. She seeks reinstatement of her benefits, the same relief provided under ERISA § 1132 (A)(1)(B).

Although Taylor's pleading characterizes her claim as a "breach of contract," it is well settled that "the constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings." Dairy Queen, Inc. v. Wood, 369 U.S. 469, 477-78 (1962). The Court finds Taylor's Complaint seeks an equitable remedy analogous to a claim brought under §1132 (A)(1)(B), which does not permit a right to a jury trial. DeFelice v. Am. Int'l Life Assur. Co. of New York, 112 F.3d 61, 64-65 (2d Cir. 1997).

In §1132 (A)(1)(B) cases, if a court finds a decision was arbitrary and capricious, "it must remand to the Trustees with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a useless formality." Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995). Here, remand would not be a useless formality because the Court has identified potentially relevant evidence Matrix did not consider. The Court therefore remands to Matrix to reconsider Taylor's claim and resolve the procedural and substantive irregularities identified herein.

**Conclusion**

Defendants' motion for judgment on the administrative record is denied. The case is remanded to Matrix for reconsideration of Taylor's claim.

So ordered.

Dated: New York, New York

September 3, 2026

Louis L. Stanton

LOUIS L. STANTON

U.S.D.J